IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| NATALIE HEATH, *et al.*, § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v. § | CIVIL ACTION NO. 1:20-cv-00890 |
| § | |
| TFS DINING, LLC, *et al.*, § | |
| § | |
| *Defendants.* § | |

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT— EMPLOYER STATUS

Defendants TFS Dining, LLC, and Jon Persinger, move for partial summary judgment against Plaintiffs on their claims that TFS Dining and Mr. Persinger qualified as their "employers" under the Fair Labor Standards Act ("FLSA").

## BACKGROUND

Plaintiffs are exotic dancers who performed at The Yellow Rose in Austin, Texas, over various periods of time. Their basic claim is that Defendants improperly considered them to be independent contractors as opposed to "employees" who are entitled to minimum and overtime wages under the FLSA.

In addition to Defendant RPM Dining, LLC, Plaintiffs have sued another entity, Defendant TFS Dining, claiming that it too was their "employer" under the FLSA. (Doc. No. 36, ¶ 14). However, RPM Dining is the only entity that does business as The Yellow Rose in Austin.[1] TFS Dining was formed in March 2019 in anticipation of opening a Yellow Rose location in Dallas. That

---

[1] **Exhibit A**, Deposition of Jon Persinger ("J. Persinger Dep."), 9:4-15 ("Q. Okay. So the only entity that does business as the Yellow Rose is the RPM Dining, LLC? A. Yes").

1

plan never got off the ground due to the pandemic. TFS Dining is a completely distinct entity from RPM Dining, has no relationship to The Yellow Rose in Austin, and it has never had any employees, independent contractors, or any other personnel.[2]

One of RPM Dining's owners is Jon Persinger. Plaintiffs allege that he "is an owner/manager of Yellow Rose who executed policies regarding payment to dancers and management of dancers, including Plaintiffs…." (Doc. No. 36, ¶ 16). In addition to other individual managers and owners they sued (but who have never been served with process), Plaintiffs claim that Jon Persinger "exerted operational and management control over Defendants," "was, and is, frequently present at, owned, directed, controlled and managed the operations at Defendants," and "controlled the nature, pay structure, and employment relationship of Plaintiffs." (Doc. No. 36, ¶ 22).

But aside from having an ownership interest in RPM Dining, Jon Persinger does not have a role in the day-to-day operation of The Yellow Rose.[3] Unsurprisingly, almost all of the Plaintiffs have no idea who Jon Persinger is. The testimony of Plaintiff Brenna Wilder is illustrative:

> **Q.** What about John Persinger? Have you ever had any personal interactions with John Persinger?
> **[Ms. Wilder].** I've heard the name. I don't know what he looks like.
> **Q.** So I take it you've never had any personal interactions with John Persinger?
> **A.** I mean, if he was in the club and it happened to be someone I talked to and I didn't know the name maybe. But I do not know who a John Persinger is.[4]

---

[2] **Exhibit B1**, Declaration of Mike Persinger ("M. Persinger Dec."), ¶¶ 4-5; **Exhibit B2**, Deposition of RPM Dining, LLC's Corporate Representative, Mike Persinger ("M. Persinger Dep."), 42:23-43:6 (explaining that TFS Dining was formed to operate a Yellow Rose in Dallas); **Exhibit B3**, Certificate of Formation and Assumed Name Certificate.

[3] *See* J. Persinger Dep., 10:25-11:11 ("Q. What role do you take on, if any, as relates to the operation of the Yellow Rose? A. None"); M. Persinger Dec., ¶ 3.

[4] **Exhibit H1**, Deposition of Brenna Wilder ("Wilder Dep."), 72:16-25.

**ARGUMENT**

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To establish the absence of genuine issue of material fact, the movant can either submit evidence negating the existence of a material element of the non-movant's claim, or "merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020) (citation and quotation marks omitted); *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (per curiam) (citation omitted).

Once the burden has shifted, the non-movant must identify specific evidence in the record and articulate how that evidence supports her claims. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). That burden will not be met by presenting "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation and quotation marks omitted).

**I.      Neither TFS Dining nor Jon Persinger qualify as Plaintiffs' "employers."**

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Fifth Circuit has consistently used a four-factor variant of the economic realities test to determine whether a defendant may qualify as an "employer" under the Act. It considers whether the defendant—

> (1) possessed the power to hire and fire employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate or method of payment; and (4) maintained employee records.

*Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (quoting *Williams v. Henagan*, 595 F.3d 610, 615 (5th Cir. 2010)); *see also Martin v. Spring Break '83 Productions, L.L.C.*, 688 F.3d 247, 251 (5th Cir. 2012); *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). A court must apply the economic realities test's factors to each individual or entity alleged to be an "employer." *Gray*, 673 F.3d at 355. "While each element need not be present in every case, finding employer status when none of the factors is present would make the test meaningless." *Id.* at 357. Moreover, facts speaking to generalized forms of control over a business are not enough; "an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013); *see Gray*, 673 F.3d at 357 (observing that "it does not follow that someone who does not control any aspect of the employment relationship is an employer").

**A.     TFS Dining was not an "employer" of any Plaintiff.**

Plaintiffs' claim that TFS Dining was one of their "employers" fails for the plain reason that the entity is not related to The Yellow Rose in Austin, Texas, in any meaningful capacity. Plaintiffs lack any evidence to the contrary.

Again, TFS Dining was formed in March 2019 in anticipation of opening a Yellow Rose in the Dallas area. RPM Dining's corporate representative, Mike Persinger, explained that the plan never came to fruition because of the pandemic.[5] And "[b]ecause that club never opened, TFS Dining has never had any employees, independent contractors, or any other personnel. RPM Dining and TFS Dining are entirely separate and distinct entities."[6]

---

[5] M. Persinger Dep., 42:23-43:6; J. Persinger Dep., 14:16-23 (explaining that Yellow Rose in Dallas never came to be).

[6] M. Persinger Dec., ¶¶ 4-5.

The only ostensible reason why TFS Dining was sued is because Plaintiffs conducted a business entity search on the Texas Secretary of State's website using the names of RPM Dining's owners. Regardless, TFS Dining is effectively a moribund entity that has no direct or indirect interest in the Austin-based Yellow Rose. It has never controlled its day-to-day operations, nor has it hired, fired, supervised, managed, controlled, scheduled, kept records for, paid or failed to pay any Plaintiff. Plaintiffs have no controverting evidence because there is none. Thus, TFS Dining is entitled to summary judgment and should be dismissed from this case because it was not and could not have been any of the Plaintiffs' "employer."

**B.    Jon Persinger does not qualify as an "employer" of any Plaintiff.**

Although Jon Persinger is an owner of RPM Dining, that does not make him an "employer" of any Plaintiff. The law is clear that an individual's status as an owner of an enterprise is not alone sufficient to subject him or her to FLSA liability; there must be some evidence that an owner exercised relevant operational control over the alleged "employee." *See Gray*, 673 F.3d at 355-56.

Plaintiffs' testimony confirms that they have no competent evidence to support their claims that Jon Persinger was their "employer." For instance, except for the fact that Ms. Heath's counsel told her that he is an owner, Ms. Heath has no idea who Jon Persinger is or what he does.[7] Likewise, Ms. Headrick has no knowledge about what Jon Persinger does because she has never met or interacted with him at all.[8] While Ms. Wilder might have heard the name Jon (or maybe

---

[7] **Exhibit E1**, Deposition of Natalie Heath ("Heath Dep."), 39:14-22; 84:13-86:5 (confirming that she lacks personal knowledge as to whether *any* of the owners or managers have the power to hire or fire, control working conditions or schedules, or maintain records).

[8] **Exhibit F1**, Deposition of Tara Headrick ("Headrick Dep."), 101:6-102:25 ("Q. Have you ever met an individual named John Persinger? A. No").

"Joe") Persinger, she also has no knowledge about what his role is at the club, if any.[9] Ms. Ramon revealed her lack of knowledge about Jon Persinger by effectively refusing to answer questions about him unless she was given his picture.[10]

1. <u>Hiring & firing</u>

The deposition testimony shows that at The Yellow Rose, Jon Persinger and the other owners collectively decide whether to hire or fire general managers and their pay—but that is where their hiring/firing power ends.[11] The general manager and floor managers approve dancers to perform and are in charge of hiring or firing employees.[12] *See Gray*, 673 F.3d at 355 ("But Powers's participation in a joint decision with co-owners of PEG [to hire or fire general managers] proves nothing about whether Powers had the authority individually to control employment terms of lower-level employees"). Indeed, Jon Persinger has not approved a new dancer in decades, nor has he fired anyone at The Yellow Rose.[13]

In their deposition testimony, Ms. Harris and Ms. Ramon (both veteran dancers at The Yellow Rose) confirmed that the club's general manager is the one who executes hiring and firing duties relative to dancers.[14] Others, like Ms. Headrick confirmed that Jon Persinger never hired or

---

[9] <u>Wilder Dep</u>., 72:16-25; 136:4-138:4 ("Q. Who is Joe [sic] Persinger? A. I don't know").

[10] **Exhibit G1**, Deposition of Vanessa Ramon ("<u>Ramon Dep</u>."), 117:24-118:15 ("Q. Have you ever met a man named John Persinger? A. I would need to see a picture"); 124:4-125:5.

[11] <u>J. Persinger Dep</u>., 17:14-24 (explaining that the owners vote on general manager hiring and firing).

[12] <u>M. Persinger Dep</u>., 54:20-55:19; 42:12-19.

[13] <u>J. Persinger Dep</u>., 17:8-13 (explaining that managers hire employees without consulting him); 22:19-22 (explaining that he has not approved any dancers); 17:25-18:2 ("Q. … as the owner, have you had to fire anyone at the club? A. No").

[14] <u>Harris Dep</u>., 139:5-21 (explaining that in her experience, the general manager has the last word on hiring and firing dancers and confirming no one supervised her schedule); Ramon Dep., 120:3-11.

fired her, which is not surprising since she has no idea who he is.[15] Ms. Heath admitted that she has no personal knowledge as to whether Jon Persinger possessed the power to hire and fire dancers, and was only able to guess that maybe he did because he is an owner.[16] But again, "a status-based inference of control cannot alone suffice to create a genuine fact issue whether [Persinger] had power to hire and fire [dancers]." *Gray*, 673 F.3d at 356.

    2.    <u>Supervision of work schedules or conditions</u>

Plaintiffs never received a schedule from anyone at The Yellow Rose, let alone Jon Persinger.[17] All of the Plaintiffs confirmed in their discovery responses that no one with the club ever instructed them what days of the week or hours of the day that they were or were not allowed to perform.[18] It follows that Jon Persinger did not supervise or control any of the Plaintiffs' schedules since they determined their own schedules.

---

[15] <u>Headrick Dep.</u>, 102:5-13 ("Q. Have any of these individuals—did any of them ever fire you? A. No. Q. Did any of these individuals ever hire you? A. No").

[16] <u>Heath Dep.</u>, 84:19-85:14 ("Q. …Joseph, John Persinger, Mike Persinger, Eddie Gonzalez, and Ricky Balderrama, did any of these people, as far as you know, possess the power to hire and fire dancers? A. I didn't know any of these people personally, I can assume that they are managerial or owners of the Yellow Rose, so I—I'm going to guess that yes, they did").

[17] <u>Harris Dep.</u>, 41:8-12 ("Q. No one gave you a written schedule? A. No"); <u>Langley Dep.</u>, 38:7-10 ("Q. … Did anyone at the club ever give you a written schedule? A. No. As far as the day you wanted to work, you could work whatever days you wanted"); <u>Headrick Dep.</u>, 102:20-22 ("Q. Did any of these individual ever say, give you a schedule? A. No"); <u>Heath Dep.</u>, 53:11-22 ("Q. No one with the club ever instructed you on what days of the week you were allowed to work, correct? A. Correct"); <u>M. Persinger Dep.</u>, 72:2-18 (explaining that The Yellow Rose does not schedule dancers).

[18] **Exhibit C2**, Harris Responses to RFA Nos. 3-6; **Exhibit D2**, Langley Responses to RFA Nos. 3-6; **Exhibit E2**, Heath Responses to RFA Nos. 4-7; **Exhibit F2**, Headrick Responses to RFA Nos. 4-7; Exhibit G2, Ramon Responses to RFA Nos. 3-6; **Exhibit H2**, Wilder Responses to RFA Nos. 4-7; **Exhibit I1**, Hopkins Responses to RFA Nos. 4-7.

As for supervising working conditions, Jon Persinger sporadically appears at the club, and has no role in setting the policies or procedures of the club generally, or with respect to dancers.[19] Ultimately, that is Mike Persinger's job, whose "role includes assisting with the company's accounting and finances, as well as attending to its personnel policies and legal issues as the need may arise," including the periodic revision of the contract that dancers sign in order to perform at the club.[20]

At best, Jon Persinger occasionally appears at the club to oversee construction or for his own social reasons.[21] But those facts, standing alone, are not indicative of his exercise of supervisory control over Plaintiffs' working conditions. *See Gray*, 673 F.3d at 356-57 ("The only possible instances in which Powers 'supervised' Gray occurred when Powers told Gray he was doing a 'great job' and when he twice asked Gray to serve specific individuals. In all three instances, however, Powers was present at the club socially"); *Rodriguez v. Tarland, LLC*, 3:18-CV-00088-E, 2019 WL 6684140, at *2 (N.D. Tex. Dec. 6, 2019) ("She 'would just show up to, you know, look around and see if everything was going well'"). Plaintiffs have nothing to support this factor aside from their own allegations, speculation, and surmise.

---

[19] J. Persinger Dep., 18:3-21 (explaining infrequent visits to club); 30:17-24 (explaining that Mike Persinger sets club policies).
[20] M. Persinger Dec., ¶ 2; M. Persinger Dep., 49:13-21 ("Q. Is there anybody else at the club that's involved, other than you and the attorneys, in putting forth the terms that are part of this license agreement? A. No, ma'am"); J. Persinger Dep., 20:1-12; 22:4-18 (explaining Mike Persinger's role relative to dancer agreement and legal issues).
[21] J. Persinger Dep., 18:3-21 ("Q. How often would you say you actually go to the club? A. Not often…. So, you know, any time I stop by the club is either to deal with a contractor who's doing a job, you know, or to just be social, say hi to some people").

3.      Determination of rate and method of payment

There is no evidence that Jon Persinger sets the rate or method of dancer payment. It is Mike Persinger who is in charge of reviewing and approving the contract that dancers execute with the club, an agreement that outlines the parameters of the working relationship and explains that dancers are responsible for making their own money.[22] And as Mike Persinger explained, The Yellow Rose has no policies about the minimum amounts that dancers may charge.[23]

Ultimately, dancers are in charge of how much they charge customers and the method of their payment. For example, Ms. Harris made at least $95,567 in 2019 purely from customers who paid her with a credit card—a significant increase in earnings as compared to prior years—and attributed that to customers simply choosing to use their cards more often.[24] Likewise, Ms. Langley, who increased her earnings from $49,735 in 2017 to $157,342 in 2019, attributed her gains to becoming more adept at talking to customers.[25] Ms. Headrick explained that it was her preference to be paid in cash.[26] Ms. Heath explained that the amount she charged was "negotiable" with her customer.[27] And Ms. Wilder testified that she believes the $20 charge for a lap dance is not a club-imposed rule, but an industry standard.[28]

While the testimony on a variety of issues regarding dancer compensation is divergent, one thing is clear—none of the Plaintiffs ever pointed the finger at Jon Persinger for interfering with

---

[22] Id., 49:13-52:9
[23] M. Persinger Dep., 51:16-52:9.
[24] Harris Dep., 105:14-106:14.
[25] Langley Dep., 64:12-24.
[26] Headrick Dep., 120:11-18
[27] Heath Dep., 36:22-37:22; 57:2-13; 83:2-13.
[28] Wilder Dep., 153:13-20.

how they were paid or how much they were paid. This factor can only weigh against a finding of "employer" status.

4. <u>Maintenance of personnel records</u>

As for the last factor, maintaining personnel records is not something that Jon Persinger handles at all. He explained that his wife, Beth Persinger, handles bookkeeping for the club at a back-office, including maintenance of dancer records.[29]

Plaintiffs have no evidence to the contrary. At best, Ms. Harris explained that she always went through a now-deceased woman named Cindy or a 'door girl' if she needed to obtain any paperwork.[30] And Ms. Headrick has no knowledge as to who at The Yellow Rose maintains any kind of personnel records, and the same was true for Ms. Heath.[31] None of the other Plaintiffs could plausibly claim that Jon Persinger maintains dancer personnel records. This factor cannot benefit Plaintiffs, who have the burden of proof.

In sum, Defendants TFS Dining and Jon Persinger have presented evidence that they were *not* the "employers" of Plaintiffs under the FLSA. Plaintiffs have nothing to refute the evidence showing that TFS Dining is not linked to RPM Dining in any meaningful regard. Nor can Plaintiffs show that Jon Persinger is anything but an owner of RPM Dining. Simply having an ownership interest in an entity, appearing at a business on occasion, or even interacting with a worker, is not enough to create a fact issue on the question of "employer" status, let alone serve as a basis for liability. "[I]ndividuals ordinarily are shielded from personal liability when they do business in a

---

[29] <u>J. Persinger Dep.</u>, 25:3-26:2
[30] <u>Harris Dep.</u>, 14:20-15:24; 140:8-14.
[31] <u>Headrick Dep.</u>, 102:23-25; <u>Heath Dep.</u>, 86:2-5.

corporate form, and ... it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA." *Gray*, 673 F.3d at 356 (citations omitted).

## CONCLUSION

Against these facts and Plaintiffs' lack of evidence, no reasonable jury could conclude that either TFS Dining, LLC, or Jon Persinger qualified as any of the Plaintiffs' "employers." For these reasons, Defendants ask the Court to grant summary judgment in their favor, dismiss them from this case, and for any other relief to which they may show themselves justly entitled.

Respectfully submitted,

WALLACE & ALLEN, LLP

*/s/ William X. King*
Casey T. Wallace
State Bar No. 00795827
SDTX Bar. No. 20117
William X. King
State Bar No. 24072496
SDTX Bar No. 1674134
440 Louisiana St., Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
cwallace@wallaceallen.com
wking@wallaceallen.com
**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure via email and/or filing through the Court's ECF System on December 23, 2021.

Jarrett L. Ellzey
Leigh Montgomery
Ghazzaleh Rezazadeh
ELLZEY & ASSOCIATES, PLLC
1105 Milford Street
Houston, Texas 77066
Tel: (713) 554-2377
Fax: (888) 995-3335
jarrett@ellzeylaw.com
leigh@ellzeylaw.com
ghazzaleh@ellzeylaw.com

John Kristensen
Jesenia A. Martinez
KRISTENSEN, LLP
12540 Beatrice Street, Suite 200
Los Angeles, California 90066
Tel: (310) 507-7924
Fax: (310) 507-7906
john@kristensenlaw.com
jesenia@kristensenlaw.com
**ATTORNEYS FOR PLAINTIFFS**

*/s/ William X. King*
William X. King