EXHIBIT A

---

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

NATALIE HEATH, ET AL        )(

    Plaintiff        )(

            )(

VS.        )(

            )( CASE NO. 1:20-cv-00890-RP

TFS DINING, LLC, AND RPM    )(

DINING, LLC DBA YELLOW ROSE;)(

JON  PERSINGER, ET AL        )(

    Defendant        )(

_____

ORAL DEPOSITION OF

JON PERSINGER

SEPTEMBER 23, 2021

(Reported Remotely)

_____

    ORAL DEPOSITION OF JON PERSINGER,

produced as a witness at the instance of the Plaintiff,

taken in the above styled and numbered cause on

September 23, 2021, between the hours of 1:31 p.m. and

2:41 p.m., before AMANDA FULLER, CSR No. 11418, in and

for the State of Texas, reported by oral shorthand

method remotely via Zoom, at the residence of the

witness, located at 3413 Aquamarine Drive, in the city

of Round Rock, state of Texas, pursuant to the Texas

Rules of Civil Procedure and any provisions stated on

the record or attached therein.

---

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFF:

    LEIGH S. MONTGOMERY (via Zoom)

    ELLZEY & ASSOCIATES, PLLC

    1105 Milford Street

    Houston, Texas 77066

COUNSEL FOR DEFENDANT:

    WILLIAM X. KING (via Zoom)

    WALLACE & ALLEN, LLP

    440 Louisiana Street, Suite 1500

    Houston, Texas 77002

ALSO PRESENT:

    JONATHAN JOSEPH (via Zoom)

    MICHAEL PERSINGER (via Zoom)

INDEX

                       PAGE

Appearances......................................... 2

JON PERSINGER

Examination by Ms. Montgomery..................... 4

Errata Sheet/Signature Page...................... 44

Reporter's Certificate........................... 46

Attached to the end of the transcript: Stipulations

---

**Page 3**

EXHIBITS

NO.    DESCRIPTION                    PAGE

1    Texas Secretary of State Assumed Name..... 8

2    Texas Secretary of State Registered Agents  9

3    The Yellow Rose Entertainer Application... 19

4    Base License Fees........................ 40

---

**Page 4**

1    THE COURT REPORTER:  We are going on the

2    record on September 23, 2021 at 1:31 p.m.

3                JON PERSINGER,

4    having been first duly sworn, testified as follows:

5              EXAMINATION

6    BY MS. MONGOMERY:

7       Q.  Sir, will you please state your full name for

8    the record?

9       A.  Jon, J-o-n, Douglas Persinger,

10   P-e-r-s-i-n-g-e-r.

11      Q.  And how are you connected to the club, the

12   Yellow Rose?

13      A.  I own 33.3 percent of the stock.

14      Q.  What is the business entity that's doing

15   business as the Yellow Rose?  What's the name of the

16   business?

17      A.  RPM Dining.

18      Q.  Is that an LLC?

19      A.  LLC.

20      Q.  Who else is an owner in RPM Dining, LLC?

21      A.  Jonathan Joseph owns a third, and WWOW Trust

22   owns a third.

23      Q.  You said WWW like World Wide Web?

24      A.  WWOW Trust.

25      Q.  Do you know who the ownership is in the trust?

---

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021

5—8

**Page 5**

1   A.  Yeah.  I'm not -- I'm not privileged to say who
2   that is, though.  That's why it's a trust.  I have an
3   NDA.
4   Q.  Oh.  All right.  Well, that may be something we
5   may request later.  Is there another person besides John
6   and Joseph that you discuss ownership issues with
7   when --
8   A.  Yes.
9   Q.  -- in regards to the Yellow Rose?
10   A.  Yes.
11   Q.  Who --
12   A.  Michael Persinger.
13   Q.  -- is that?
14   A.  Michael Persinger.
15   Q.  Is Michael Persinger an owner in any way?
16   A.  No.
17   Q.  Is Michael Persinger related to you?
18   A.  Yes.  He's my brother.
19   Q.  And what is Michael Persinger's role with the
20   Yellow Rose?
21   A.  He's a chief consultant.
22   Q.  And what does he do as the chief consultant?
23   A.  He consults us on accounting matters and on
24   FSLA matters -- or FLSA matters, and he generally writes
25   the procedures and manuals and stuff like that and is in

**Page 6**

1   charge of, you know, kind of compliance stuff.
2   Q.  Is Michael Persinger an attorney?
3   A.  No.
4   Q.  Is he a CPA?
5   A.  No.
6   Q.  And how long have you been an owner in RPM
7   Dining, LLC?
8   A.  Since its formation.  I don't recall what year
9   it actually was formed.  The first -- the first
10   corporation was a different corporation when we took
11   ownership 28, 29 years ago.  But I don't recall which
12   year we actually created the LLC.
13   Q.  Do you remember what the former corporate
14   entity was named?
15   A.  Gala Entertainment.
16   Q.  And you said you first took ownership in Gala
17   Entertainment 28, 29 years ago?
18   A.  Yeah.  I believe it was -- if I recall right,
19   it was the third quarter of 1993 is when I bought stock
20   in the company.
21   Q.  Since the time that you first obtained -- well,
22   let me be clear.  Was Gala Entertainment the corporate
23   entity that did business as the Yellow Rose?
24   A.  Yes.
25   Q.  Since you had ownership interest in the Yellow

**Page 7**

1   Rose, was there anyone besides Mr. Joseph and the trust
2   that was an owner?
3   A.  Yes.  At one point we had an owner named David
4   Frank, and then at one time one of the original owners
5   would be my father, Gerald Persinger.
6   Q.  When did Mr. Frank relinquish or cease to be an
7   owner?
8   A.  You know, I don't recall exactly when.  I want
9   to say it was the fourth quarter of 2020.
10   Q.  So I may speak at some point today about the
11   relevant period when it comes to this lawsuit, and for
12   your reference, what that means is the period from
13   August -- I think it's 24th, but I'm going to say
14   August 2017 to present.  During that time period, the
15   relevant period, was Mr. Frank -- did he have some
16   ownership interest in RPM Dining, LLC?
17   A.  Yes.
18   Q.  And did you just buy him out?  Or how did he
19   stop being an owner?
20   A.  It was an agreement between Jonathan Joseph and
21   David.  They swapped the business ownership interest in
22   companies they had mutual ownership in.
23   Q.  Okay.  And do you know the reason for the swap
24   in ownership?
25   A.  No.

**Page 8**

1   Q.  Other than your ownership in the Yellow Rose,
2   do you own any other adult entertainment clubs?
3   A.  I have 20 -- I think 22 or 22.5 percent
4   interest in the Red Rose.
5   Q.  And where is the Red Rose located?
6   A.  It's in Austin, Texas.
7   Q.  How long have you had an ownership interest in
8   the Red Rose?
9   A.  Yeah, that's a good question.  I think about a
10   year and a half, maybe two years.  I don't remember when
11   we incorporated.
12   Q.  Other than the Yellow Rose and the Red Rose, do
13   you have ownership interest in any other adult
14   entertainment clubs?
15   A.  No.
16   Q.  Do you have any involvement in employees,
17   staff, consulting in any other adult entertainment clubs
18   besides Red Rose and Yellow Rose?
19   A.  No.
20   Q.  I'm going to show you what I'm going to mark as
21   Exhibit 1 to the depo.  Give me just a second so I can
22   get my folder.  I'll represent to you this is something
23   I pulled up off the Texas Secretary of State web site,
24   which has a lot of ownership information and companies.
25   And this I pulled up is a company called TFS Dining,

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
9–12

Page 9

1    LLC.  Is that a corporate entity that you have any
2    ownership interest in?
3        A.   Yes.
4        Q.   What is -- and I'll represent the page that I
5    pulled up here -- and I know it doesn't highlight it
6    very well when you pull it off the Secretary of State.
7    This is an assumed name page, and it's showing that TFS
8    Dining, LLC is -- has got the assumed name Yellow Rose,
9    at least as of March of 2019.  Do you -- is TFS Dining,
10   LLC connected to the Yellow Rose?
11       A.   No.  I don't know why that would be.  It's got
12   to be a clerical error.
13       Q.   Okay.  So the only entity that does business as
14   the Yellow Rose is the RPM Dining, LLC?
15       A.   Yes.
16       Q.   All right.  Don't want to get my exhibits mixed
17   up, so hold on.  Let me show you one more on TFS Dining.
18   Okay.  I'll show you what I'm marking as Exhibit 2 to
19   the deposition and -- listing the management -- or, I
20   guess -- yeah, management that the Texas Secretary of
21   State has for TFS Dining, LLC, and I see your name
22   listed on there.
23             Are those the owners, the correct owners,
24   of TFS Dining or people that have ownership interest in
25   TFS Dining, LLC in Exhibit 2?

Page 10

1        A.   I can't -- can you blow that up?
2        Q.   Sure can.
3        A.   I have damaged corneas.  I don't see very well,
4    so --
5        Q.   Well, and it's awfully small, as well, so --
6        A.   Okay.  Jonathan, David, and Jon.  Well, yeah.
7        Q.   Okay.
8        A.   Yeah.
9        Q.   And what's the purpose of TFS Dining, LLC?
10       A.   TFS Dining, LLC, as I recall, was associated
11   with the formation of the Red Rose.
12       Q.   Oh, I see.
13       A.   Like I said, that's -- that I would recall,
14   so --
15       Q.   All right.  But it doesn't have anything to do
16   with the Yellow Rose, right?
17       A.   Defiantly not.  Absolutely not.
18       Q.   As an owner in the Yellow Rose, do you receive
19   any financial benefits?
20       A.   Distributions on profits.
21       Q.   How often are distributions made?
22       A.   It's sporadic, you know?  Sometimes a couple of
23   times a year; sometimes three times a year.  Possibly
24   two or three times a year, in general.
25       Q.   What role do you take on, if any, as relates to

Page 11

1    the operation of the Yellow Rose?
2        A.   None.
3        Q.   Okay.  Who does take on operation of the Yellow
4    Rose?
5        A.   General management --
6        Q.   Who's the general --
7        A.   -- and the floor managers.
8        Q.   -- oh, I'm sorry.
9        A.   General manager and the floor managers.
10       Q.   Who's the general manager of the Yellow Rose?
11       A.   Eddie Gonzalez.
12       Q.   And does Eddie Gonzalez have to consult you on
13   any matter related to the operation of the Yellow Rose?
14       A.   If he -- if he has a question, you know, and he
15   wants to bounce it off me, he does, but he doesn't have
16   to.  He doesn't get micromanaged by me at all.
17       Q.   Okay.  What sorts of things would he -- has he
18   typically come to you with?
19       A.   You know --
20       Q.   -- as may relate to the operation of the Yellow
21   Rose?
22       A.   I only talk to him maybe, God, twice a month if
23   that.
24       Q.   Okay.
25       A.   You know, I don't talk to him very often.  And,

Page 12

1    you know, most of the things would be like, you know,
2    if -- if there's a, you know, an expenditure or a
3    promotion or something like that that he has questions
4    about.
5             Or if there's a breach of peace that
6    happened at the club and he wants to know how to handle
7    it from a TABC standpoint.  You know, that sort of
8    stuff.  You know, but in terms of the, like, the
9    day-to-day minutia of running the club, nothing.
10       Q.   So he might come to you if there was, like, a
11   legal issue happening at the club?  Like a criminal
12   matter or some --
13       A.   Yeah.  If we have an altercation in the parking
14   lot.  Or if we have to, you know, escort a customer.
15   Or, you know, a customer, you know, feels like, you
16   know, somebody did something or treated him wrong.  Or,
17   you know, anything that might result in a TABC issue or
18   lawsuit.  Eddie would come to me, probably, first out of
19   anybody.
20       Q.   You said he might also come to you about, like,
21   a promotion at the club?
22       A.   Yeah.  You know, if -- if they want to turn
23   around and run like -- especially food promotion, stuff
24   like that.  Because I have a little bit of a background
25   in that, and I can help them keep their food costs

JON PERSINGER                                         September 23, 2021
NATALIE HEATH vs TFS DINING                                      13–16

Page 13

1  in-line. You know, he'll bounce it off me.
2      Q. What's the --
3      A. He doesn't -- he doesn't need my permission,
4  but he'll bounce stuff off me.
5      Q. As the owner, you don't require him to ask you
6  permission to set a food promotion at the club, correct?
7      A. No. No.
8      Q. You said you have a background in the food
9  industry, I take -- I guess?
10     A. Well, yeah. I've helped the kitchen out there
11 for a number of years, and, you know, I've learned a few
12 tricks. So I have a really good friend of mine that
13 worked for Darden Foods, big food company. You aware of
14 them?
15            And, you know, I've got access to him, so
16 I've been able to bounce ideas off him, you know? So
17 I've got more of a food background than anybody else. I
18 don't think a food industry company would hire me, but,
19 yeah, I --
20            MS. MONGOMERY: Oh, did I lose you?
21 Mr. Persinger? Can you hear me? I may have lost him.
22            THE COURT REPORTER: Did you want to go
23 off the record until we can get him back?
24            MS. MONGOMERY: I was waiting to see if it
25 just, like, popped back up again, but it doesn't seem to

Page 14

1  be.
2            THE COURT REPORTER: Okay. So off the
3  record?
4            MS. MONGOMERY: Sure.
5            MR. KING: Yeah.
6            (Brief recess.)
7      Q. Sir, can you tell me -- you -- I understand
8  there was a technical issue and your computer rebooted.
9  You said you had looked something up that was a question
10 I had asked you earlier. What --
11     A. Yeah.
12     Q. -- did you find out?
13     A. You had asked me about TFS Dining --
14     Q. Yes.
15     A. -- being associated with the Yellow Rose.
16     Q. Yes.
17     A. And that was associated with a Yellow Rose that
18 we intended to open up in Dallas, and it didn't happen,
19 so --
20     Q. So wrong Yellow Rose, right?
21     A. Yeah, wrong Yellow Rose. Yeah. It was a
22 potential Yellow Rose, and it just didn't happen because
23 of COVID and some other stuff.
24     Q. I asked earlier who was generally in charge of
25 the operations at Yellow Rose, and you had mentioned the

Page 15

1  general manager Eddie Gonzalez. How long has he been
2  the general manager for the operations of the Yellow
3  Rose?
4      A. He was assigned that position at the Yellow
5  probably a year and a half, maybe two years ago. I
6  think it's about a year and half. He's worked for us
7  for over three years.
8      Q. Prior to Mr. Gonzalez being the general
9  manager, who was the general manager?
10     A. Jason Edwards.
11     Q. Is Jason still -- work with the Yellow Rose?
12     A. No.
13     Q. Did -- was he terminated?
14     A. No. We -- amicably parted ways with the Yellow
15 Rose.
16     Q. Let me ask it a different way. Did you
17 amicably ask him to leave and he said yes?
18     A. Yes, I guess you could say that.
19     Q. Well, there's a difference between a general
20 manager saying, "I'm leaving," and you as an owner
21 saying, you know, "I'd like you to leave." And so what
22 was the reason for Mr. Edwards departure?
23     A. He -- he had an opportunity that was closer to
24 home.
25     Q. So is he not from Texas?

Page 16

1      A. No, but he's from way, way, way South Austin
2  which is almost another country.
3      Q. Okay. To your knowledge, is he managing
4  another club?
5      A. Yes.
6      Q. What clubs does he manage now?
7      A. He manages the Red Rose.
8      Q. Did you ask him to move to the Red Rose?
9      A. Asked him to be closer to home, and it just
10 made more sense, so --
11     Q. So you said that switchover between Mr. Edwards
12 and Mr. Gonzalez happened about a year and half ago?
13     A. Yeah, something like that. That's my
14 recollection, yeah.
15     Q. Let me say it this way: Is it pre-COVID or
16 post COVID?
17     A. Like kind of right at the COVID shutdown point.
18     Q. So, like, March of 2020?
19     A. Yeah. Something like that, yeah.
20     Q. Okay. So prior to when Mr. Edwards was the
21 general manager, was he generally the one that was in
22 charge of operations at the Yellow Rose.
23     A. Yes.
24     Q. And was your relationship the same as it is
25 with Eddie in that you would consult with him on -- or

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
17–20

**Page 17**

1  he would come to you and consult on certain matters like
2  legal matters or maybe matters related to an area of
3  your expertise, but anything else he was handling for
4  the club?
5      A.  Yeah.  Like -- like Eddie, I didn't talk to him
6  a whole lot, you know?  I mean, he might call a couple
7  of times a month, if that.
8      Q.  Who's in charge of hiring the staff at the
9  Yellow Rose?
10     A.  The employees are hired by the managers and
11  floor managers.
12     Q.  Do they ever consult with you on hiring?
13     A.  No.
14     Q.  Did you hire the general manager, though?
15     A.  The ownership group talks about it.  I have an
16  input and a vote.
17     Q.  And would the ownership group also set the
18  payroll or salary and benefits for the general manager
19  of the club?
20     A.  Yes.
21     Q.  So if Eddie, for example, wanted a raise, he'd
22  have to talk to you and the other owners to ask for a
23  raise?
24     A.  Right.  And we would vote on it.
25     Q.  And do you know -- as the owner, have you had

**Page 18**

1  to fire anyone at the club?
2      A.  No.
3      Q.  How often would you say you actually go to the
4  club?
5      A.  Not often.  I have a 2017 vehicle.  It just
6  turned 20,000 miles on it, so I don't leave Round Rock
7  very often.  So, you know, any time I stop by the club
8  is either to deal with a contractor who's doing a job,
9  you know, or to just be social, say hi to some people.
10     Q.  Yeah.  And my question is just how frequently
11  would you say you do that.  Like once a week?  Once a
12  month?
13     A.  Yeah, I would say -- I would say, you know, at
14  least, you know, once a week or maybe even a little less
15  than that.
16     Q.  Now --
17     A.  And sometimes -- sometimes I go weeks and don't
18  go by the club, so --
19     Q.  As we sit here today, when was the last time
20  you were at the club?
21     A.  Sunday.  I went and watched a football game.
22     Q.  The building that the Yellow Rose is in, is
23  that something that is rented, or is it owned by the
24  ownership?
25     A.  No, we lease it.

**Page 19**

1      Q.  And do you lease it from anybody that is also
2  an owner in the Yellow Rose?
3      A.  No.
4      Q.  It's a totally separate person or entity?
5      A.  Totally separate.
6      Q.  That lease that you have, is that something you
7  as an owner were involved in the negotiation of?
8      A.  Me personally, no.
9      Q.  Is there a different owner that was involved?
10     A.  We handed that to Mike Persinger, and he
11  negotiated that lease.
12     Q.  And if that lease -- if and when, I guess, that
13  lease comes up for renewal, is Mr. Mike Persinger the
14  person that would be in charge of kind of negotiating or
15  dealing with that?
16     A.  Yes.
17     Q.  Let me show you what I'll mark as Exhibit 3.
18  Okay.  I think this already has everything redacted, but
19  if it doesn't, we may need to redact some.  I think the
20  personal information's redacted, but let me just make
21  sure.
22     A.  You have a question about this?
23     Q.  I do.  I'm sorry.  I have to write down each of
24  my exhibits so I remember what I'm marking to give to
25  the court reporter.  It's -- it's been the hassle of

**Page 20**

1  Zoom depositions.  What I've marked as Exhibit 3 is
2  labeled as the Entertainer Application.  Are you
3  familiar with this application, sir?
4      A.  Yeah, I seen it.
5      Q.  Is it something that the ownership came up with
6  for the entertainers at the club?
7      A.  The application was something that Mike, again,
8  came up with.  And that was him dealing with labor
9  lawyers putting this together.
10     Q.  When did it first -- when was it first, I
11  guess, utilized by the club for the entertainers.
12     A.  I don't have no idea.
13     Q.  Well, was it more than five years ago?
14     A.  This particular one?
15     Q.  No.  I'm just saying any -- I guess any
16  entertainer app.
17     A.  Yeah.  I believe -- well, I believe is not good
18  because I don't know.  But, you know, I do know that
19  there's certain things that have to be done like
20  E-Verify where we have to turn around and get certain
21  information from, you know, independent contractors, you
22  know?  And I think that something like this has been
23  used for a long time.
24     Q.  Let me ask about this part of it.  There's this
25  page that -- and I'll make it bigger so you can see it.

JON PERSINGER                                    September 23, 2021
NATALIE HEATH vs TFS DINING                      21–24

Page 21

1  It's entitled Regulatory Compliance.
2      A.  Uh-huh.
3      Q.  This is Page 3 of Exhibit 3.
4      A.  Yeah.
5      Q.  Is that something that has -- is that something
6  that you're knowledgeable of?
7      A.  I've never read through it myself, personally.
8  Mike, you know, like I said, works with the attorneys
9  and works with the labor attorneys.  So, personally,
10  I've never read through this one.
11     Q.  Do you know what steps have to be taken in
12  order for a new entertainer to start performing at
13  Yellow Rose?
14     A.  Well, we -- I know that -- that we only approve
15  independent contractors in person and that a manager has
16  to agree to let that contractor work on his shift.  And,
17  you know, they've got to have a Social Security card,
18  and they've got to have an ID that's current, and we've
19  got to E-Verify them.  And they have to, you know, fill
20  out the -- the agreement, and they have to fill out a
21  W-9.
22     Q.  Let me --
23     A.  Just like I do with all the contractors that do
24  maintenance and construction work and air-conditioning
25  work, so --

Page 22

1          MS. MONGOMERY:  Objection, nonresponsive.
2  Well, I'll say objection to the nonresponsive portion of
3  that.
4      Q.  This Page 4 that I've pulled up of this -- I'm
5  calling it the Entertainer Packet.  Is this the
6  agreement that you were referring to that -- I'm going
7  to make it -- I'm going to show you the full-page, and I
8  can scroll down through.  It says License, Terms, and
9  Conditions.  And I can make it bigger if you want to see
10  it bigger.  Is this what each of the entertainers has to
11  sign, to your knowledge?
12         MR. KING:  Objection, form.
13     A.  Yeah, to my knowledge.  Like I said, I -- Mike
14  is the one who set this up with the lawyers.  You know,
15  I trust, you know, the lawyers that he's hired, so I've
16  never actually read through the contract myself.  So,
17  you know, I can't say that I've actually seen it or
18  digested it.  So I know they exist.
19     Q.  Have you ever -- have you ever gone through and
20  approved a new entertainer to perform at the Yellow
21  Rose?
22     A.  Never.  In 29 years, I never have.
23     Q.  Have you ever told either the manager or
24  some -- the general manager or another manager of the
25  club that there's an entertainer that you do not want to

Page 23

1  perform at the club anymore?
2      A.  I don't think so.  I doubt it.
3      Q.  And one thing that you had said when you were
4  going through some of the things for the entertainer --
5  and maybe I heard you correctly; I'm not sure -- was
6  that you only approve independent contractors; is that
7  true?
8      A.  What are you talking about?  For entertainers?
9      Q.  Yeah.
10     Q.  Yes.
11     A.  Yeah.  We have no entertainers that are
12  employees.  They're all independent contractors.
13     Q.  And when you say that, you mean that they have
14  all signed an agreement?  This license agreement that
15  sets forth independent contractor terms?
16     A.  Yes.  And, you know, we don't schedule them,
17  and we don't turn around and tell them when to work
18  or -- you know, they're an independent contractor in
19  every sense of the word, so -- and --
20     Q.  Well, let's go through -- what is the sense of
21  the word that you understand that makes them independent
22  contractors?
23     A.  What do you mean?
24     Q.  Well, you're saying that they're independent
25  contractors in every sense of the word.  I asked if it

Page 24

1  was because they signed this license agreement.  You
2  said that and every other thing.  So I'd want to know
3  what -- from your perspective, what that is.
4      A.  Well, I'm not a -- I'm not a lawyer, so --
5      Q.  I didn't --
6      A.  -- you know?
7      Q.  -- I'm not asking you --
8      A.  Maybe my perspective doesn't hold the same
9  weight as, you know, a labor attorney.
10     Q.  Well, I didn't say it did, sir.  I'm just
11  trying to understand your perspective.
12     A.  Right.  Well, my perspective is that they've
13  signed a contract and an agreement with the company that
14  they work as an independent contractor, and we've agreed
15  to uphold everything within that contract.
16     Q.  Is there anything else that you believe makes
17  them independent contractors?
18     A.  The contract says so, and our labor attorneys
19  say so.  Multiple labor attorneys say so.
20     Q.  Just be clear, I'm not going to ask you any
21  specifics about attorney-client conversation.  So I just
22  wanted to understand your perspective on that question.
23     A.  Yes, ma'am.
24     Q.  Does the club keep track of when
25  entertainers -- like the dates and hours that

JON PERSINGER                                          September 23, 2021
NATALIE HEATH vs TFS DINING                                      25–28

Page 25

1  entertainers performed?

2     A.  No.

3     Q.  Who's in charge of, like, the bookkeeping for

4  the club?

5     A.  The back office is run by my wife, Beth, and

6  all the paperwork flows through her.  And she offices up

7  in Round Rock, and, you know, I help her out.

8     Q.  Now, is it Beth Persinger?

9     A.  Yes.

10     Q.  The back office, what-all is the back office

11  responsible for?

12     A.  Payroll, payables, filing, paying taxes, you

13  know, that we have to pay the state.  And we do an audit

14  on employee files, make sure that as they come in, they

15  have everything that's required by the federal and state

16  government.

17     Q.  And that's where -- the back-office, that's

18  where the employee files are kept?

19     A.  Yes.

20     Q.  Do they also keep the -- I guess, the

21  applications and information on each of the entertainers

22  that perform there?

23     A.  Yes.  We -- yeah, the folders that have the --

24  the independent contractor agreement and their

25  application, copy of their Social Security, copy of

Page 26

1  their driver's license.  That's all kept at the

2  back-office, too.  And --

3     Q.  So all the --

4     A.  -- we use the W-9 information that they provide

5  us to issue 1099s.

6     Q.  Now, the 1099s that are issued to the

7  entertainers, what are the monies that are included in

8  the 1099s?

9     A.  When a customer turns around and pays them in a

10  gift certificate we refer to as Rose dollars, they have

11  to turn those in, and they get paid cash for that.  And

12  then we turn around and keep track of that, and if they

13  make over $600 in Rose dollars, then we have to report

14  that to the IRS.

15     Q.  So to be clear, when a customer wants to pay

16  using a credit card, does he do that transaction with

17  some sort of staff member at the club and then the staff

18  member at the club gives him the Rose dollars, if you

19  will?

20     A.  Yes.

21     Q.  Okay.  And then the Rose dollars are then given

22  out either to pay for dances or tips that an entertainer

23  performs, right?

24     A.  Right.  Customer gets handed the Rose dollars,

25  and what he does with them, you know, is to his

Page 27

1  discretion.

2     Q.  How does the entertainer -- or who is she

3  supposed to exchange those Rose dollars with for cash?

4     A.  Door girl.

5     Q.  Does the door girl keep track of the dance

6  dollars being exchanged per entertainer name?

7     A.  Yes.

8     Q.  Other than tracking the credit card to Red Rose

9  dollar exchange, are any other monies that are given to

10  the entertainers, are any of those monies tracked by the

11  club?

12     A.  No.

13     Q.  So tips are not tracked by the club, correct?

14     A.  No.

15     Q.  And any dance fees or VIP charges that an

16  entertainer may receive, those aren't tracked by the

17  club, correct?

18     A.  No.  The only thing we track is the Rose

19  dollars.

20     Q.  Now, there's other employees of the club other

21  than the managers; correct?

22     A.  Bartenders, waitresses, barbacks.

23     Q.  And I understand that the general manager or

24  another manager has the ability to hire the other staff

25  at the club, correct?

Page 28

1     A.  The employee staff?  Yes.

2     Q.  Do you have any role in hiring the employee

3  staff?

4     A.  No.

5     Q.  The employee staff -- well, hold on.  The lower

6  level -- I'm just going to call them the lower-level

7  managers, the non-general manager.  Do you set the other

8  managers' pay?

9     A.  Yeah, you know, I've never really been involved

10  in actually setting the pay with them.  So me,

11  personally, no.

12     Q.  Well, I guess, you had said before when your --

13  for the general manager, the ownership votes on -- and

14  would vote and approve on the pay for the general

15  manager.  Is that also true for the other managers at

16  the club?

17     A.  General manager would approve any pay raises,

18  you know, and, you know, have to substantiate them to

19  ownership.

20     Q.  Is the same true for the other staff at the

21  club other than managers?  Does the general manager set

22  what the bartenders and the door guy -- door girl are

23  going to receive?

24     A.  Yeah.  Everything is in charge -- I mean is in

25  the general manager's hands.  And, you know, I mean,

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
29–32

Page 29

1  there are standards that, you know, have been set in
2  terms of what, you know, bartenders make and, you know,
3  barbacks make that have been there for years, so -- but,
4  you know, if there's a particular person that, you know,
5  he wants to give more money to, you know, he certainly
6  can if he feels necessary to do it.
7     Q.  The standards that have been there for years,
8  is that something that the ownership set?
9     A.  I assume at one point in time, but, you know,
10  like I said, I wasn't involved in it.
11    Q.  The bartenders and the waitresses, do they keep
12  their tips?
13    A.  Yeah.
14    Q.  Do they get paid the -- I guess I don't know
15  what it's called.  I'd call it the tipped employee pay.
16  But it's less than minimum wage because they receive
17  tips?
18    A.  Yeah.  With the employees, they get paid, you
19  know, the tip minimum, you know, that the state sets.
20    Q.  Right.
21    A.  And then they have to declare their tips, and
22  we monitor it every payroll.  And if somebody does not
23  make minimum wage, then the company kicks in and makes
24  sure that it does.
25    Q.  Other than the bartenders and waitresses, is

Page 30

1  there anyone else at the club that's treated like the
2  tipped employee?
3     A.  Barback.
4     Q.  And you know what I mean when I say the tipped
5  employee?  The one whose tips are being monitored by the
6  club and --
7     A.  Yeah.  Anybody we pay less than the seven
8  whatever an hour -- whatever the minimum wage is --
9  yeah.
10    Q.  Okay.
11    A.  So bartender, waitress, barback.
12    Q.  Perfect.  Now, earlier you had mentioned that
13  Mr. Michael Persinger had -- he generally would create,
14  like, the policies and procedures that were enforced at
15  the club; is that true?
16    A.  Yes.
17    Q.  And did you as the owner have any role in
18  setting the policies or procedures of the club that were
19  in effect during the relevant period?  That's the
20  August 2017 to present.
21    A.  No.
22    Q.  Okay.  You just delegated that task completely
23  to Mr. Michael Persinger?
24    A.  Yes.
25    Q.  Does Michael Persinger -- is he at the club on

Page 31

1  a regular basis?
2     A.  No, not anymore.
3     Q.  When did he -- was there a time period he used
4  to be?
5     A.  Well, when he -- when he lived here, he would
6  go by and have drinks, but -- yeah.
7     Q.  When did he move away?
8     A.  I'm guessing about a year ago.  Maybe longer.
9     Q.  Has the Yellow Rose been through any prior --
10  other than the case we're here about today, have they
11  been through any other prior FLSA lawsuits?
12    A.  Other than the one that -- that was initiated
13  back in '93, not that I recall.
14    Q.  All right.  I'm going to set the 1993 one aside
15  for a minute.
16    A.  Yeah, so -- yeah.
17    Q.  That's been a minute.  Well, one question about
18  it:  Were you the owner at the time of the one -- from
19  the 1993, or was that something you're just aware of?
20    A.  No.  It's something I'm aware of because it was
21  an issue that had to be resolved for me to agree to
22  invest in Gala Entertainment, is that lawsuit had to be
23  resolved with the Department of Labor.  And it was,
24  so --
25    Q.  And it was --

Page 32

1     A.  -- invest.
2     Q.  -- was it -- the Department of Labor was
3  involved?
4     A.  Yeah.  From what I recall, there was a -- there
5  was a working relationship with the DOL to come up with
6  something that they were happy with.  And everything was
7  dropped, and we were in good standing, and we could move
8  forward.
9        So, you know, it was a condition, like I
10  said, upon me investing, so -- and it got resolved.  But
11  I mean, it was 100 years ago.  I can't remember what I
12  had for breakfast yesterday, so --
13    Q.  I get it.  I just -- I appreciate your honesty.
14    A.  Yeah.
15    Q.  The Red Rose, how long has it been open?
16    A.  Two years.
17    Q.  Has the Red Rose -- has the Red Rose had any
18  claims?  FLSA claims?
19    A.  No.
20    Q.  The Yellow Rose -- back to them -- have they
21  had any other lawsuits filed by employees that may not
22  have been related to the FLSA?
23    A.  Not that I recall.
24    Q.  You said you had -- you assisted your wife in
25  the back office management; is that true?

Page 33

1    A.  Yeah.  She -- she does the back office work,
2  and, you know, when she needs help, I help her out.
3    Q.  Do you review any of the financials for the
4  club?
5    A.  Just the -- when the P&Ls are done, I'll take a
6  look at them.
7    Q.  Is that a yearly thing that's done?
8    A.  Monthly, when we're -- when we're lucky.  But
9  yeah, so --
10    Q.  You strive for monthly but don't always
11  reach --
12    A.  Strive -- yeah, we strive for monthly.  Doesn't
13  always happen.
14    Q.  The club's web site, do you have any
15  involvement with the content that goes on the web site?
16    A.  No.
17    Q.  What about social media for the club?
18    A.  No.
19    Q.  Do you have any involvement in setting, like,
20  an advertising or promotion budget for the club?
21    A.  No.
22    Q.  Who would do those things?
23    A.  Good question, you know?  I mean, I'm not -- I
24  don't attend the managers' meetings, you know, and all
25  that's discussed at managers' meetings which happen, you

Page 34

1  know, once a week.  But I don't -- I don't attend them,
2  so --
3    Q.  Is there, like, a budget -- for lack of a
4  better word, is there, like, a food and alcohol budget
5  for the club?
6    A.  No.
7    Q.  That's just -- is that something that you'd
8  entrust to the management?
9    A.  Well, you know, what we look at is inventories.
10  And, you know, if the inventory looks good at the end of
11  every month and, you know, we don't have slippage and
12  we're selling things for, you know, the prices that are
13  set in the POL and we get paid everything, then we're
14  generally, you know, okay with what they're doing.
15    Q.  Would the --
16    A.  But in terms -- in terms of a budget set?  No.
17    Q.  Who sets the prices for, like, the food and
18  beverage?
19    A.  Generally that's discussed in the managers'
20  meetings, you know?  I mean, the market changes, so, you
21  know, as -- as they go in and out of other clubs and see
22  what other clubs are doing, you know, it fluctuates.
23  And I assume that's done in the managers' meetings.
24    Q.  If they're going to change or, like, increase
25  across-the-board the price of the alcohol beverages that

Page 35

1  are sold at the club, is that something that they run by
2  you as --
3    A.  No.
4    Q.  -- the ownership?
5    A.  No.
6    Q.  Does the ownership have regular meetings about
7  the club?
8    A.  One meeting in October.  Every year we kind of
9  get together.
10    Q.  Do you have that set up for this year?
11    A.  Yeah, actually, we do.
12    Q.  When are you guys going to meet?
13    A.  Mid-October.  And we're going to meet -- yeah,
14  mid-October.
15    Q.  Do the managers provide the -- hold on.  Let me
16  back up a minute.  Does any of the staff at the club
17  have any benefits other than their pay?
18    A.  No.
19    Q.  So no paid time off?
20    A.  Well -- oh.  If -- if -- you know, if we have a
21  long-term cook, you know, in the kitchen that has been
22  there a while, you know, and they take a vacation, we'll
23  go ahead and pay them for the week.
24    Q.  There's no, like --
25    A.  But that's about it.

Page 36

1    Q.  Yeah.  There's no, like, set policy like --
2    A.  No set -- no set policy, no.
3    Q.  So, like, if you've been there five years, you
4  don't get, like, two weeks paid vacation?
5    A.  No, no.  No formal policy like that.
6    Q.  Is there any health insurance benefits?
7    A.  No.
8    Q.  Do any of the staff at the club wear a uniform?
9    A.  Waitresses do.
10    Q.  Anyone else?
11    A.  No.
12    Q.  Is there a dress code for the club?
13    A.  For patrons?
14    Q.  Yes.
15    A.  Yeah.  You know, generally, you know, we -- we
16  don't like them coming in tank tops or, you know -- you
17  know, shorts, you know, that are baggy and down to the
18  ground.  But for the most part, we're pretty relaxed
19  about that.
20    Q.  Who enforces that dress code, per say?
21    A.  Management.  Management.
22    Q.  I'm guessing the club has some sort of bank
23  account for its deposits?
24    A.  Yeah, I hope so.
25    Q.  I hope so, as well.  Who at the club has

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
37—40

Page 37

1   authorization to -- like signatory authorization on the
2   account?
3       A.   That would be myself, my wife, and Jonathan
4   Joseph.
5       Q.   Let me take like a five minute break and see
6   what else I have to ask you, okay?
7       A.   All righty.
8           (Brief recess.)
9       Q.   Is there anyone, any of the staff -- well,
10  let's say it this way.  Is there any other person
11  working at the club that is considered an independent
12  contractor, other than the entertainers?
13      A.   No, not that I'm aware of.
14      Q.   And I'm not talking about, you know, somebody
15  you might hire to, you know, fix one thing at the club
16  and leave.  I'm talking about people that go there
17  regularly.
18      A.   Yeah.  I don't -- I don't know the relationship
19  with the valets, or even if they have one.  And I know
20  that it's gone back-and-forth, so I don't know the
21  status of that now.  I'm just not that involved, so --
22      Q.   Got it.  The --
23      A.   Other than that --
24      Q.   -- the entertainer application and packet that
25  we looked at earlier, it's Exhibit 3, is there a similar

Page 38

1   sort of contract that the employees of the club have to
2   sign?
3       A.   No.
4       Q.   When did Mike Persinger -- when did he first
5   start handling that paperwork and/or working with the
6   labor lawyers on the paperwork?
7       A.   Well, he was the president of the company, you
8   know, for -- all through the '90s.  And, you know, I
9   can't remember when he -- when he stepped down as that,
10  but might've been 2006 or -- might've been 2000.  But
11  anyway, you know, so he's always worked with the
12  attorneys.
13          Anything to do with, like, an attorney
14  that we have to deal with, you know, Mike spearheads
15  that.  Always has spearheaded it and just updates, you
16  know, the rest of the ownership via text or call --
17  phone call or whatever, so -- but, you know, anything to
18  do with contracts, anything to do with that, he's --
19  he's our Huckleberry.
20      Q.   And you wouldn't accept any entertainers that
21  wanted to perform as employees, correct?
22          MR. KING:  Objection, form.
23      A.   I'm not sure what you mean by that question.
24      Q.   My question is that you -- well, you as the
25  owner do not want any entertainers performing at the

Page 39

1   club that desire to be employees, correct?
2       A.   Well, I've never been asked the question.  I
3   don't think any of them want to be considered employees.
4   Not any that I've ever talked to, so --
5       Q.   Yes.  But that's not my question of what they
6   might want.  My question is what is acceptable to you as
7   the owner.
8       A.   Well, you know, I mean, the business model that
9   we have, you know, seems to make, you know, everybody
10  happy so I'm fine just keeping it the way it is.
11      Q.   Well, my question is:  Would you accept an
12  entertainer who wanted to be an employee?
13      A.   I don't know.  I'd have to consult my attorney
14  on that because that would be a very odd question, you
15  know?  I mean, you're throwing a curveball from way left
16  field on that question.  So I don't think that question
17  would ever come up, so I don't even know how respond to
18  it.  But, you know, it'd be something that I would have
19  to consult our labor attorney on.
20      Q.   The entertainers, do they pay like a -- I call
21  it a house fee.  But do they pay fees to the club?
22      A.   There is a house fee, yes.
23      Q.   Is that something that the club tracks?  Like
24  what entertainers pay in what amount?
25      A.   Yes.

Page 40

1       Q.   And who set the amount of the fees?
2       A.   The amount was set years ago by Mike Persinger.
3       Q.   And have they increased or decreased over time?
4       A.   I really don't know.
5       Q.   Does Mr. Gonzalez have the authority to
6   increase or increase those fees?
7       A.   He would have to consult the ownership on that
8   one probably.  But, you know, it hasn't been asked.  You
9   know, it was set by -- by Mike years ago, and as far as
10  I know, it hasn't changed in a long time, you know?
11  It -- you know, if they show up at the beginning of the
12  shift, they don't pay anything.
13      Q.   Is the --
14      A.   Like --
15      Q.   -- sorry.
16      A.   I said, you know, it starts with them.  If they
17  show up at the beginning of a shift and are ready to
18  work, they don't pay anything.  So there is no house
19  fee, you know?  And if they choose -- if they want to
20  come later, then, you know, it escalates every -- I
21  think every 30 minutes, if I remember right.
22      Q.   Yeah.  I'll go ahead and I'll show you what I
23  have here.  I'm going to mark it as Exhibit 4.  This is
24  an example of some of the fees, at least that we're
25  aware of.

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
41—44

Page 41

1    A.   Okay.  Yeah.  So you can see that the dayshift
2    escalates $5 every 30 minutes.  And then night shift,
3    looks like it's the same thing.  So, yeah, that was --
4    that was -- been in place since, you know, since Mike
5    had the authority to make them, and he was operating as
6    president.  I don't think they've changed, so --
7        Q.   Are there certain entertainers that are
8    approved work the dayshift -- or I'm not saying that
9    right.  Hold on.  Are there certain entertainers that
10   are only approved to work during the dayshift as opposed
11   to being able to come at night?
12       A.   That is determined by the managers of the
13   shifts, and they can pick or choose, you know, who they
14   allow to work their shifts.  And, you know, the
15   ownership doesn't get involved in that at all.
16       Q.   So the managers could actually --
17       A.   So, yeah, you need approval.  So if a girl
18   wants to work a dayshift then she wants to work Tuesday
19   through Friday, then she talks to Kenny.  You know, if
20   she wants to work a weekend, you know, then she talks to
21   Chris.
22           You know, if she wants to work a split
23   shift, then it would be Kenny or Chris, same day, so --
24   and then so on and so forth.  And then, you know,
25   anything at night would be approved from, you know,

Page 42

1    Eddie on down to -- probably five different floor
2    managers can make that approval.  It's not -- it's not a
3    complicated process.
4        Q.   Do you know the --
5        A.   They just need --
6        Q.   -- sorry.
7        A.   I said they just need to get approval.  It's
8    not a complicated process.
9        Q.   Do the entertainers have to sign in with anyone
10   when they come to perform?
11       A.   The -- yeah.  They sign in at the front door,
12   if I recall, and then the door girl gives them a slip.
13   And once they're ready, then that slip is signed by a
14   floor manager.  I'm not sure if DJs can sign it too,
15   but -- and then it goes back up to the front door and
16   let's them know when they start when they're ready to
17   go, so --
18       Q.   Is there another process when the entertainer's
19   done for the evening?  Does she have to sign out with
20   anyone?
21       A.   No.
22       Q.   Are those -- well, scratch that.  The club, is
23   it subject to some sexually oriented business
24   ordinances, to your knowledge?
25       A.   Yes.

Page 43

1        Q.   And who is in charge of making sure that the
2    club is in compliance with the ordinances?
3        A.   Mike.
4        Q.   I understand some of the ordinances are
5    particular to the entertainers at the club, correct?
6        A.   What -- what do you -- what do you mean by
7    that?
8        Q.   Meaning that the way an entertainer is -- her
9    body is covered or how she entertains is part of the
10   sexually oriented business ordinances, correct?
11       A.   Yeah, they -- yeah, they have comportment
12   clauses in terms of, you know, what they want to see and
13   don't see, so --
14       Q.   Who at the club is responsible for making sure
15   the entertainers are complying with the ordinances while
16   they're --
17       A.   Managers.
18       Q.   -- in the club?
19       A.   Managers.
20           MS. MONGOMERY:  I will reserve the rest of
21   my questions for now and pass the witness.
22           MR. KING:  Mr. Persinger, we'll reserve
23   questions for you for trial.
24               (Deposition concluded.)
25           (Persinger Exhibits No. 1 - 4 marked.)

Page 44

CHANGES AND SIGNATURE
DEPOSITION OF JON PERSINGER
SEPTEMBER 23, 2021

PAGE    LINE    CHANGE                REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

JON PERSINGER
NATALIE HEATH vs TFS DINING

September 23, 2021
45–48

---

Page 45

I, JON PERSINGER, have read the foregoing

transcript and hereby affix my signature that same is

true and correct, except as noted above.

_____

JON PERSINGER

THE STATE OF TEXAS        )(

COUNTY OF _____ )(

Before me, _____,

on this day personally appeared JON PERSINGER, known to

me (or proved to me under oath or through

_____) (description of identity

card of other document) to be the person whose name is

subscribed to the foregoing instrument and acknowledged

to me that they executed the same for the purposes and

consideration therein expressed.

Given under my hand and seal of office

this _____ day of _____, 2021.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF TEXAS

---

Page 46

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION
NATALIE HEATH, ET AL       )(
    Plaintiff        )(
                    )(
VS.                )(
                    )( CASE NO. 1:20-cv-00890-RP
TFS DINING, LLC, AND RPM   )(
DINING, LLC DBA YELLOW ROSE;)(
JON  PERSINGER, ET AL      )(
    Defendant        )(
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF JON PERSINGER
SEPTEMBER 23,2021

I, AMANDA FULLER, Certified Court Reporter in and

for the State of Texas, hereby certify to the following:

That the witness, JON PERSINGER, was duly sworn by

me, and that the transcript of the oral deposition is a

true and correct record of the testimony given by the

witness;

That the deposition transcript was submitted on

_____ to William X. King,

attorney for DEFENDANT for examination, signature and

return to me by _____;

That the amount of time used by each party at the

deposition is as follows:

Leigh S. Montgomery - 38 minutes

That pursuant to information given to the deposition

officer at the time said testimony was taken, the

following includes counsel for all parties of record:

---

Page 47

LEIGH S. MONTGOMERY

ELLZEY & ASSOCIATES, PLLC

1105 Milford Street

Houston, Texas 77066

WILLIAM X. KING

WALLACE & ALLEN, LLP

440 Louisiana Street, Suite 1500

Houston, Texas 77002

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule

203 of TCRP will be certified to after they have

occurred.

Certified to by me this _____ day of _____,

2021.

_____

AMANDA FULLER, Texas CSR No. 11418

Expiration Date: 11-30-21

Bryant & Stingley, Inc., CRN No. 512

2010 E. Harrison

Harlingen, Texas 78550

956-428-0755

---

Page 48

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION
NATALIE HEATH, ET AL       )(
    Plaintiff        )(
                    )(
VS.                )(
                    )( CASE NO. 1:20-cv-00890-RP
TFS DINING, LLC, AND RPM   )(
DINING, LLC DBA YELLOW ROSE;)(
JON  PERSINGER, ET AL      )(
    Defendant        )(
FURTHER CERTIFICATION UNDER RULE 203 TCRP
TO THE ORAL DEPOSITION OF JON PERSINGER
SEPTEMBER 23,2021

I, Amanda Fuller, certify that the original Changes

and Signature Page of JON PERSINGER:

_____ was received by the Deposition Officer on

_____;

_____ was not received by the Deposition Officer;

That, if returned, the attached Changes and

Signature Page contain any changes and the reasons

therefor;

If returned, the original Changes and Signature Page

was delivered to Leigh S. Montgomery, Custodial

Attorney;

That $_____ is the deposition officer's charges

to PLAINTIFF for preparing the original deposition

transcript and any copies of exhibits;

JON PERSINGER                                                      September 23, 2021
NATALIE HEATH vs TFS DINING                                                      49

Page 49

That the deposition was delivered in accordance with

Rule 203.3, and that a copy of this certificate was

served on all parties shown herein on

_____ and filed with the Clerk.

Certified to by me this _____ day of

_____, 2021.


_____

AMANDA FULLER, Texas CSR No. 11418

Expiration Date: 11-30-21

Bryant & Stingley, Inc., CRN No. 512

2010 E. Harrison

Harlingen, Texas 78550

956-428-0755